356 F.Supp.2d 1002 (2005)
James B. KENNER, Plaintiff,
v.
CITY OF RICHMOND HEIGHTS, MO., Defendant.
No. 4:03 CV 666SNL.
United States District Court, E.D. Missouri, Eastern Division.
February 10, 2005.
*1003 James N. Foster, Jr., Mary Carter Martin, # 86356, St. Louis, MO, for City of Richmond Heights.
Al Johnson, Johnson, Fellows, Blake and Terry, Melvin Raymond, Wilson and Associates, St. Louis, MO, for Plaintiff.

MEMORANDUM OPINION
LIMBAUGH, Senior District Judge.
This matter is before the Court on defendant's motion to enforce settlement agreement (# 20), filed April 13, 2004. Responsive pleadings were filed as of July, 2004. On July 20, 2004 this Court removed this case from its August 2, 2004 trial docket and set the instant motion for an evidentiary hearing on August 5, 2004. A hearing was conducted before this Court on August 5 and 19, 2004. The matter is now ripe for disposition.
After reviewing the parties' relevant pleadings and the testimony and exhibits offered at the hearing[1], the Court finds makes the following findings of fact.
During the relevant time-period, defendant employed plaintiff as a police officer. During his tenure as a Richmond Heights police officer, plaintiff had several instances of job performance problems and was placed on probation in January and February 2002. Following his second disciplinary action in February 2002, plaintiff was informed of the defendant's decision to terminate his employment as of February 28, 2002. Plaintiff met with Michael A. Schoedel, defendant's City Manager, to discuss his termination. Plaintiff believed his termination was racially-motivated. Defendant discharged plaintiff for violation of its rules and regulations while on probation, effective February 28, 2002. Subsequent to February 28, 2002, plaintiff did not perform any work, including any police enforcement-related work, for the defendant.
On or about March 1, 2002 plaintiff contacted Al Johnson regarding his termination. He and Mr. Johnson, an attorney, discussed plaintiffs situation. Plaintiff was primarily concerned about lack of medical/health insurance coverage due to the termination and wanted to "resign" rather than be terminated for purposes of future job prospects. Mr. Johnson informed plaintiff that he could not represent him for purposes of commencing any legal action because of his professional and personal relationship with the defendant[2]. However, he agreed to represent plaintiff in attempting to "resolve the matter".
On March 5, 2002 plaintiff and his attorney, Al Johnson, met with Schoedel and defendant's counsel, James N. Foster, Jr. at Mr. Foster's office to discuss a full and complete settlement of any claims plaintiff may have against the defendant in connection with his termination. The attorneys with their respective clients stayed in separate *1004 rooms while negotiations ensued. Mr. Johnson testified that the primary goal (of he and plaintiff) was to resolve the matter amicably so as to facilitate plaintiffs ability to procure other employment, especially in the law enforcement field. Mr. Johnson testified that plaintiff wanted to convert his termination into a resignation, effective within ninety (90) days. He was concerned about the loss of any work-related benefits, such as medical coverage while looking for a full-time job. He wanted to remain on the defendant's payroll for ninety (90) days although he would not be actively working for the defendant. If at the end of the ninety (90) day period plaintiff had not obtained other full-time employment, plaintiff would resign his employment as a police officer for the defendant. If he did obtain other full-time employment prior to the expiration of the ninety (90) day period, plaintiff would resign as of the date he obtained the other employment. Plaintiff also wanted to be able to keep his part-time job as the "Director of Security" for AMC Theaters during this ninety (90) day period. Plaintiff and his attorney were, at all times during the settlement negotiations, in complete communication with each other.
At the end of the day on March 5, 2002 the parties had negotiated an agreement to resolve all matters in dispute then in existence between them. This agreement was memorialized in a document entitled ESSENTIAL NEGOTIATED TERMS OF SETTLEMENT AND RELEASE, dated March 5, 2002. Defendant's Hearing Exhibit A.[3] The document reads as follows:
ESSENTIAL NEGOTIATED TERMS OF SETTLEMENT AND RELEASE
March 5, 2002
; June 7, 2002 hypothetical resignation datean undated letter of resignation will be tendered by James Kenner. The date will remain open on the letter until June 7, 2002 at which time the date will be placed on the letter.
 A reference letter for employment purposes will be drafted by Al Johnson acceptable to the City.
 Reference inquiries made to any supervisory staff will be handled in a consistent fashion utilizing the employment reference letter as a guideline, or other documents as agreed upon by the parties.
 Mr. Kenner's membership in The Heights will remain free until December 31, 2002.
 Mr. Kenner will remain on the medical benefit plans through the end of June 2002 unless other medical plans are available to him upon employment. He will still be required to pay the $45 per month contribution. Thereafter, if COBRA is required it will be provided to him.
 If Mr. Kenner wants to communicate to the Council or to the Mayor in any way, his letter must be drafted to the attention only of Mr. Schoedel. James will not initiate any other correspondence, letters, contacts, telephone calls, visits or other conversations will occur between Mr. Kenner or any member of the Council or the Office of the Mayor. *1005 Inquiries will be referred to Mr. Schoedel.
 Mr. Kenner will remain on the payroll for three (3) months effective today through Friday, June 7, 2002 unless other employment is obtained. In the event other full time employment is obtained, the payroll arrangements will cease and Mr. Kenner will thereafter resign due to other employment opportunities. For purposes of this agreement, Mr. Kenner's current part-time security job is not to be considered.
 Mr. Kenner will receive one (1) week's cash vacation payment effective immediately. His remaining vacation time will remain within the control of Richmond Heights until three (3) months has passed or until such time as he has obtained alternative employment, at which time all unpaid vacation will be paid. No additional vacation will be accumulated during this time.
 A full release drafted by the City will be presented to Mr. Johnson and thereafter executed by Mr. Kenner. Mr. Kenner is to return all items attached as Exhibit # 2 immediately.
This document was signed by Michael Schoedel, plaintiff James Kenner, attorney Al Johnson, and attorney James N. Foster, Jr.
On March 7, 2002 Johnson sent a letter to Foster thanking him for discussing plaintiffs case and "assist[ing] in working out a settlement agreement." Defendant's Hearing Exhibit B. Johnson also included with the letter a draft of the employment reference letter together with an undated resignation as set forth in the "Essential Terms" document.
On March 7, 2002 Foster sent Johnson a letter enclosing the proposed Settlement Agreement, Waiver and Release. Defendant's Hearing Exhibit C. Foster stated that he had "included each and every parameter of the Agreement in which we agreed upon on Tuesday, March 4, 2002."[4] He further admitted to adding certain language "regarding the reimbursement of your client's tuition payments in which we failed to discuss on Tuesday." The defendant would not seek any payments from plaintiff as reimbursement for past tuition payments; however, the defendant would not pay for any additional tuition reimbursement payments from the date of the Essential Terms document through June 7, 2002 or anytime thereafter. Finally, Foster stated that he had added language regarding the plaintiff's part-time and future employment to "include the fact that he still may not obtain employment as a security officer at the Esquire Theater pursuant to his prior probationary conditions." However, defendant was not prohibiting plaintiff to continue as Director of Security for AMC Theaters "as we agreed upon". Defendant's Hearing Exhibit C.
On March 11, 2002 Johnson wrote Foster with proposed revisions to the alleged settlement agreement. Johnson testified that the changes proposed were not "substantive changes". He informed Foster that plaintiff was concerned that defendant was telling people who called that plaintiff was no longer employed with defendant, and had disengaged his voice mail. Johnson indicated "[t]hat this needs to be rectified immediately or I am afraid that it could destroy the whole agreement." The remainder of the letter highlights several changes to wording in the formalized settlement agreement. Plaintiff's Hearing Exhibit 3.
Meanwhile, defendant issued a check to plaintiff, dated March 3, 2002, for accrued *1006 vacation. Defendant's Hearing Exhibit I. This check was cashed by plaintiff.
On or about March 19, 2002 Elise Mars, defendant's Human Resource Coordinator, signed plaintiff's reference letter. Defendant's Hearing Exhibit D. Plaintiff testified that he received a copy of this signed reference letter prior to March 21, 2002 but did not discuss same with Johnson until sometime after March 21, 2002. Johnson testified that he did not recall any specific discussion with the plaintiff regarding the reference letter.
On March 20, 2002 Johnson sent a letter to Foster stating that "[i]f we do not have the signed Settlement Agreement by noon on Thursday, March 21, 2002, I have been authorized by my client [plaintiff Kenner] to withdraw the resignation agreement." Plaintiff's Hearing Exhibit 4. He again expressed plaintiff's displeasure at what he believed was the defendant's continuance to tell callers that plaintiff was no longer employed by the defendant.
A signed copy (by Michael Schoedel) of the revised Settlement Agreement, Waiver and Release, dated March 20, 2002 was forwarded to Johnson on March 21, 2002.[5] Plaintiff testified that he had seen the revised Settlement Agreement, Waiver and Release signed by Schoedel and had discussed it with Johnson; however, Johnson testified that he could not recall seeing the signed Settlement Agreement, Waiver and Release prior to the hearing. Plaintiff never signed the revised Settlement Agreement, Waiver and Release that Schoedel had signed.
On March 21, 2002 Johnson wrote Foster stating that plaintiff had decided to accept a termination and seek separate counsel and proceed with litigation. Plaintiffs Hearing Exhibit 5. On March 22, 2002 defendant issued a paycheck to plaintiff for the pay period of March 3 through March 17, 2002. Plaintiff picked up this paycheck and cashed same on March 25, 2002. Furthermore, on March 25, 2002 plaintiff completed the paperwork for medical/health care coverage provided by defendant. Defendant's Hearing Exhibit H.
On March 27, 2002 plaintiff sent a letter to Schoedel informing defendant that he had rejected the Essential Terms document and Settlement Agreement, Waiver and Release and was now "ready to return to duty". Plaintiffs stated desire to "return to duty" was inconsistent with Johnson's letter of March 21 telling defendant that plaintiff had decided to accept a termination and proceed with litigation. Plaintiff testified that he thought he had the right to withdraw his resignation because he had not signed the Settlement Agreement, Waiver and Release and was entitled to get his job back. Plaintiffs Hearing Exhibit 6. On April 3, 2002 Foster sent a letter to Johnson in response to Johnson's March 21st letter, reiterating the defendant's position that it believed that a settlement had been reached. Defendant's Motion Exhibit J. On April 5, 2002 Johnson sent Foster a letter asserting that defendant had "breached the agreement" in several ways including communicating to third parties that plaintiff was no longer with the police department when "the most significant part of the agreement we reached was that Jim would be allowed to stay on with the Department and would not finalize his resignation for three months, or until he found other employment.". Plaintiffs Hearing Exhibit 8. Although he writes of reaching an agreement that had been breached, Johnson then goes on to state that "[a]dditionally, we never reached an agreement on major issues in the case, including the wording of *1007 the settlement release." Plaintiff's Hearing Exhibit 8.
Also, on April 5, 2002, plaintiff's new attorney, Melvin Raymond, wrote defendant's co-counsel Gregory Shoemaker requesting a copy of the signed Settlement Agreement, Waiver, and Release that had been sent to Johnson on March 21, 2002. Defendant's Hearing Exhibit F. Shoemaker responded to Raymond's request and forwarded a copy of the signed Settlement Agreement, Waiver and Release. Defendant's Hearing Exhibit G.
By letters dated May 9, 2002 and June 6, 2002, Schoedel reiterated that the parties had reached an agreement to settle any and all claims plaintiff may have against the defendant and that the defendant had continued in good faith to honor the terms of the agreement. Defendant's Motion Exhibit N.
Defendant continued to send paychecks to plaintiff until June 2002, and continued to pay plaintiffs health insurance premiums on his behalf. Plaintiff cashed a vacation check issued by the defendant on June 14, 2002. Defendant's Hearing Exhibit I. Defendant maintained plaintiffs membership at The Heights [6] at no cost to the plaintiff through December 2002.
In August 2002 plaintiff filed a charge of discrimination against the defendant with the EEOC. He subsequently filed the instant lawsuit on or about May 22, 2003.
On April 13, 2004 defendant filed the instant motion to enforce the settlement agreement allegedly reached on March 5, 2002. In accordance with this Court's ADR referring order (# 24), filed April 19, 2004, the parties attended an ADR conference on May 25, 2004 in hopes of settling this litigation through the alleged settlement agreement of March 5, 2002 or by a new settlement. Usually, the ADR Neutral files his/her report simply acknowledging whether or not the parties achieved a settlement. However, in this case, the ADR Neutral specifically noted the plaintiffs failure to participate in good faith in stating:
"Plaintiff, James Kenner, did not participate in good faith, by refusing to execute the settlement agreement accepting his last demand of $35,000.00, based on an alleged misunderstanding that his demand did not include his attorney's fees."
Alternative Dispute Resolution Compliance Report (# 29), filed June 2, 2004. Following receipt of the Neutral's Report, the Court set the instant pending motion for evidentiary hearing. See, Court Order # 36, filed July 20, 2004.
After careful consideration of the matter, including review of the parties' motion and hearing pleadings, testimony and exhibits offered at the hearing, and the relevant caselaw, the Court finds that the parties did enter into an enforceable settlement agreement on March 5, 2002 and that said agreement fully and completely settled all claims as contained in the plaintiffs complaint presently filed before this Court.
Settlement agreements are governed by contract law. Visiting Nurse Assoc., St. Louis v. VNAHealthcare, Inc., 347 F.3d 1052, 1053 (8th Cir.2003); Sheng v. Starkey Laboratories, 117 F.3d 1081, 1083 (8th Cir.1997); MIF Realty L.P. v. Rochester Associates, 92 F.3d 752, 756 (8th Cir.1996); Tirmenstein v. Central States Basement and Foundation Repair, 148 S.W.3d 849, 851 (Mo.App.2004). In order for a settlement agreement to be enforceable, the parties must have reached agreement on the essential terms of the deal. Sheng v. Starkey Laboratories, 117 F.3d. at 1083; Sheng v. Starkey *1008 Laboratories, 53 F.3d 192, 194 (8th Cir. 1995); MIF Realty, at 756. Even if the parties have left some details for counsel to work out through further negotiation, a legal, valid settlement agreement still exists. Sheng v. Starkey Laboratories, 117 F.3d. at 1083; Worthy v. McKesson Corp., 756 F.2d 1370, 1373 (8th Cir.1985); see also, Nwachukwu v. St. Louis University, 114 Fed.Appx. 264 (8th Cir.2004)(unpublished opinion holding that a valid settlement agreement existed "even though the final agreement contained more expansive or additional clauses related to confidentiality, release of liability, disclaimer of fault, nondisparagement, and reinstatement or reemployment")[7]; Johnson v. Dobson, et. al., 230 F.3d 1363 (8th Cir.2000)(unpublished opinion holding that the "parties entered into a valid, oral, global-settlement agreement on May 14, notwithstanding minor later-resolved issues."); Vulgamott v. Perry, 2004 WL 2792193 (Mo.App. Dec.7, 2004)(unpublished opinion finding that "[a] contract will be valid and enforceable even if some terms may be missing or left to be agreed upon as long as the essential terms are sufficiently definite to enable the court to give them exact meaning."). Finally, the party requesting enforcement of a settlement agreement has the burden of proving its claim for relief by clear, convincing, and satisfactory evidence. Visiting Nurse Association, St. Louis, at 1053 (citations omitted); Tirmenstein, at 851 citing Payne v. E & B Carpet Cleaning, Inc., 896 S.W.2d 650, 651 (Mo.App.1995).
Plaintiff contends that no settlement agreement was reached on March 5, 2002 primarily for three (3) reasons: Firstly, the reference letter was not fully executed. Secondly, the resignation letter was not executed. Finally, a "full release" was not executed. All three (3) of these arguments lack merit.
Under the terms of the Essential Terms document, plaintiffs attorney was to draft a reference letter for employment "acceptable to the City". Plaintiffs attorney (Johnson) drafted such a reference letter, agreed-upon revisions were made, and the final draft was signed by Ms. Mars and placed in plaintiffs employment file. Thus, a reference letter was "executed" as called for in the Essential Terms document.
Under the terms of the Essential Terms document, plaintiff's attorney (Johnson) was to draft an undated resignation letter in which a resignation date would be entered depending upon whether or not plaintiff obtained full-time employment prior to June 7, 2002 (otherwise, the June 7, 2002 date would be inserted). Such a letter was drafted by plaintiffs attorney and the date of "June 7, 2002" was inserted and same was placed in plaintiff's employment file.[8] Thus, the resignation letter was "executed" as called for in the Essential Terms document.
Finally, under the terms of the Essential Terms document, the defendant was to draft and present to plaintiff's attorney (Johnson) a "full release" and that plaintiff was to execute same. There was no requirement *1009 under the Essential Terms document that the defendant sign (execute) any release presented to the plaintiff. Plaintiff testified that he did not sign the release presented because he objected to not being able to work at the Esquire Theater in Richmond Heights during the subject ninety (90) day period. However, Schoedel and Johnson both testified that the matter of plaintiff working at the Esquire Theater was discussed on March 5, 2002 and that the defendant objected to plaintiff working there until after June 7, 2002 because it viewed plaintiff as an "inactive employee" until then. Plaintiff testified that he understood that he could not work directly at the Esquire Theater until after June 7, 2002. The Essential Terms document references this understanding when it states "[f]or purposes of this agreement, Mr. Kenner's current part-time security job [Director of Security for AMC Theaters] is not to be considered." Furthermore, in his letter proposing changes to the initial draft of the Settlement Agreement, Waiver and Release, plaintiffs attorney (Johnson) did not propose any changes to ¶ 13 which constituted the "full release". Thus, since there was never any objection lodged by plaintiff or his attorney to the release language, defendant did draft and present to plaintiff for his execution a "full release" as called for in the Essential Terms document.
Plaintiff's testimony and his pleadings appear to offer two (2) "alternative" theories upon which he requests the Court not to enforce the settlement reached on March 5, 2002. Firstly, he asserts that the defendant had "breached" the settlement by telling people and prospective employers that he was no longer employed by the defendant. It is noteworthy that plaintiff did not offer one objective piece of evidence to substantiate this claim. He did not nor has not to this day offered any testimony or affidavit by anyone who called the defendant and was told that plaintiff was no longer employed. Furthermore, the Essential Terms document states that "[r]eference inquiries made to any supervisory staff will be handled in a consistent fashion utilizing the employment reference letter as a guideline, or other documents as agreed upon by the parties." Plaintiff has not identified any supervisory staff member (of defendant) who responded to a reference inquiry or any inquiry regarding plaintiff in a manner inconsistent with the terms of the Essential Terms document. Consequently, plaintiff has failed to substantiate any claim that defendant "breached" the terms of the Essential Terms document.[9]
Plaintiff's second alternative theory for denying the instant motion is that the Essential Terms document was nothing more than an "offer of settlement" which he rejected as of March 21, 2002. Unfortunately for plaintiff, his actions subsequent to March 21, 2002 show anything but a rejection of an "offer of settlement".
Pursuant to contract law, in order to have a binding agreement there must be "an objective manifestation of mutual assent". Visiting Nurse Assoc., St. Louis, at 1054; Stewart v. Prof'l Computer Ctrs., Inc., 148 F.3d 937, 939 (8th Cir. 1998); Bugg, et. al. v. Fleet Mortgage Group, Inc., 80 Fed.Appx. 526 (8th Cir.2003)(unpublished opinion citing Stewart v. Prof'l Computer Ctrs, Inc., supra.). Instead of looking to see if the parties entertain the same subjective views as to the alleged agreement's meaning in order *1010 to determine whether the parties had a "meeting of the minds", "[r]ather a court looks to the parties' objective manifestations of intent and interprets those manifestations as a reasonable person would. If those manifestations produce a reasonably ascertainable objective meaning, an enforceable agreement exists." Visiting Nurse Assoc., St. Louis, at 1054 (citations omitted); Stewart v. Prof'l Computer Ctrs, Inc., at 939.
Kenner's actions after he alleged rejected the March 5, 2002 "offer of settlement" reasonably show that he believed a settlement had taken place. After March 21, 2002, plaintiff cashed at least one paycheck, which he received on March 25, 2002, and one check for accrued vacation sometime after June 14, 2002. On March 25, 2002 he applied for and was included in the defendant's medical insurance plan. He accepted membership in The Heights. Plaintiffs actions clearly show that he had not repudiated any "offer" but instead was accepting the defendant's performance of its obligations under the Essential Terms document, thereby, negating any repudiation of the settlement reached.[10]
Furthermore, in all his correspondence to the defendant, plaintiff's counsel (Johnson) referred to an "agreement" being reached. He speaks of plaintiff wanting to "withdraw from the resignation agreement" (Plaintiff's Hearing Exhibit 4) and of not "finalizing the agreement" (Plaintiffs Hearing Exhibit 8). It is clear to this Court that plaintiffs counsel believed that an agreement had been reached but that defendant had "breached" it in a number of insignificant ways.
Finally, it is clear to the Court that at all times the defendant manifested its intention to perform its obligations under the Essential Terms document. The City issued to the plaintiff all checks and payments required under the terms of the settlement. The City allowed the plaintiff to participate in its medical insurance plan as required under the terms of the settlement.[11] The City provided him with membership in The Heights through December 2002 as required. The City accepted a reference letter on plaintiffs behalf and placed same in his employment file as required under the terms of the Essential Terms document. The City retained an undated (later dated as of June 7, 2002) resignation letter as tendered by plaintiffs attorney in plaintiff's employment file as required. Finally, the City tender to the plaintiff for his execution a full release as required.
The Court has reviewed all relevant testimony and exhibits and finds nothing that indicates a positive intention by either party not to perform the essential terms of the agreement reached on March 5, 2002. The Court does not believe "that disagreements as to the language used to memorialize the agreement or whether such language conformed to the intent of the parties when they reached the agreement is sufficient to find a repudiation of the parties original agreement." Vulgamott v. Perry, supra.
The Court finds that the defendant has met its burden by presenting "clear, convincing, and satisfactory" evidence that a binding settlement agreement had been *1011 reached between the parties on March 5, 2002. As the Essential Terms document is entitled, all material and essential terms of the agreement had been reached despite the fact that the parties left insubstantial matters for later negotiation. Plaintiffs attorney (Johnson) who negotiated the Essential Terms contract and was in constant communication with plaintiff throughout the day on March 5, 2002 testified that the Essential Terms document covered the primary issues; i.e. "the issues in the forefront". For whatever reason, plaintiff changed his mind about settling his litigation against the defendant; however, "the fact that a party decides after the fact that a contract is not to its liking does not provide a reason to suppose that a contract was not in fact formed or to release that party from its obligation." Visiting Nurse Assoc., St. Louis, at 1055 citing Worthy v. McKesson, at 1373.
In light of the Court's above-referenced findings of fact and conclusions of law, the Court will grant the defendant's motion to enforce (# 20).
NOTES
[1] Although at the onset of the hearing, certain exhibits were received conditionally and with objections; the parties ultimately withdrew all objections to all exhibits received by this Court. The Court again accepts all exhibits submitted by the parties into evidence and accords them the weight the Court deems relevant to the issues at hand.
[2] Mr. Johnson had been Richmond Heights' prosecuting attorney from 1992-96, he lived in Richmond Heights, and personally knew several of the defendant's city officials, including those in connection with the police force.
[3] There was some confusion at the hearing as to the identification of exhibits due to duplicative filing in connection with the motion pleadings and the hearing. For clarity and simplicity, the Court's citation to exhibits in this memorandum opinion is according to the exhibit list as filed by the parties at the hearing. For example, although the document entitled ESSENTIAL NEGOTIATED TERMS OF SETTLEMENT AGREEMENT is listed as Exhibit B for the instant motion, it is listed as Hearing Exhibit A. Furthermore, since the parties have filed some of the same exhibits, the Court's citation to one party's exhibit is not reflective of any bias on the Court's part, it is just a matter of judicial efficiency.
[4] The Court assumes that this is a typographical error as to the date since there is no dispute that the settlement negotiations were conducted on March 5, 2002.
[5] Schoedel testified that he was out of town as of March 20 and March 21, 2002 but that he had authorized his secretary to affix his stamped signature and forward it.
[6] Richmond Heights Community Center.
[7] It is not the Court's usual practice to cite to unpublished opinions except in those rare circumstances wherein the unpublished opinion provides the Court with significant assistance in addressing the issues at hand. In this case, the unpublished opinions cited by the Court were instrumental in assisting the Court in arriving at its ultimate determination regarding the instant motion.
[8] Although Schoedel was not aware of whether plaintiff's file showed whether plaintiff resigned or was terminated; Amy Schutzenhofer, defendant's current Assistant City Manager, testified that plaintiff's file showed that he had resigned as of June 7, 2002. This testimony was not refuted at the hearing.
[9] The Court concurs that if plaintiff believed that defendant had "breached" the Essential Terms document, then his remedy is to seek damages for such an alleged breach, file a separate claim for the alleged breach, or seek enforcement of the settlement agreement. His remedy is not to simply disavow the settlement agreement's existence.
[10] Furthermore, the Court concurs with defendant that there was never any discussion regarding a "revocation period" nor that the Essential Terms document contains any "revocation clause". Plaintiff has failed to provide any evidence that what was reached on March 5, 2002 was an "offer" which he could "reject" at any time he unilaterally decided.
[11] The fact that plaintiff later opted to participate in another medical benefits plan in no way undercuts the Court's findings since all defendant was required to do was keep Kenner on the medical benefits plan through June 2002 unless he made other arrangements.